UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ANDREW HICKS,

    Plaintiff,

v.

20th CIRCUIT COURT and
THOM LATTIG, in his individual
and official capacities,

    Defendants.

File No. 1:25-CV-

Hon.

_____

# COMPLAINT AND JURY DEMAND
_____

### Complaint

Plaintiff Andrew Hicks, by and through his attorneys, Pinsky Smith, PC, states as follows:

### Jurisdiction, Venue, and Parties

1. This is an action seeking to remedy violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; and related violations of Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1011 *et seq.*

1

2. This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3. Plaintiff Andrew Hicks is a resident of Ottawa County, Michigan. Defendants currently employ Plaintiff as a Treatment Manager in the Ottawa County Juvenile Court ("the Juvenile Court"), which is part of Defendant 20th Circuit Court. However, Defendants constructively demoted Plaintiff to a Treatment Specialist in June 2023.

4. Defendant 20th Circuit Court ("the Court") is the Michigan state circuit court for the County of Ottawa, headquartered in Grand Haven, Michigan. The Court is an "employer" within the meaning of the FMLA and the PWDCRA.

5. Defendant Thom Lattig is the Juvenile Court Director for the Court. He works for the Court within Ottawa County, Michigan, and he is an "employer" within the meaning of the FMLA and the PWDCRA.

6. The acts that are the subject of this action occurred in Ottawa County in the Western District of Michigan.

7. Venue is proper within this judicial district under 28 U.S.C. § 1391(b).

### Factual Allegations

8. Plaintiff has worked for the Juvenile Court since July 2021, when he was first hired as a Treatment Specialist. Plaintiff is a licensed master's-level psychologist in Michigan who is also board-certified as an alcohol and drug counselor and clinical supervisor. Further, Plaintiff is registered as a clinical member of the Association for the Treatment and Prevention of Sexual Abuse

2

(ATSA). In Plaintiff's first job position as a Treatment Specialist for Defendants, Plaintiff's job duties included the provision of assessment and direct clinical services to juveniles and families served or supervised by the Juvenile Court.

9. Mr. Hicks was an excellent and promising employee for Defendants, who promoted Plaintiff to Treatment Manager from his entry level position soon after he was initially hired. Before December of 2022, Defendants judged Plaintiff's performance as excellent. In fact, the Juvenile Court Director, Defendant Lattig, told Plaintiff that if an assistant director position opened up, Defendants would likely redefine it as a clinical director position and that Plaintiff would be a great match for such a promotion. With his promotion to a Treatment Manager in 2022, Plaintiff's job duties included a lighter direct client caseload, managing up to six social workers with various levels of licensure, reviewing and providing supervisory sign-off to their reports, and participating in various policy and management functions of the Juvenile Court.

10. On or around December 18, 2022, Plaintiff came down with COVID-19. While at first County management followed standard procedure for employees diagnosed with COVID and allowed him to work from home for the first week, in the following week Plaintiff had preapproved vacation and holiday paid time off. Defendant Lattig insisted that Plaintiff continue to work through his time off and imposed deadlines for work to be completed before his scheduled return to work from sick leave. Out of fear of retaliation, Plaintiff complied, despite being quite ill.

11. However, on January 3, 2023, Plaintiff was diagnosed with bilateral multifocal COVID pneumonia. Although he was supposed to return to work that day, he informed his supervisor at the time that he would not be able to return to work as scheduled due to his health.

12. Throughout early 2023, Plaintiff's health continued to deteriorate as long COVID symptoms took hold. He was off work for nearly six months using a combination of FMLA and short-term disability leave. He complied with FMLA documentation regulations. Plaintiff's physician diagnosed him with long COVID, which is a federally-recognized disability.

13. Plaintiff later learned the Court's management backdated Plaintiff's FMLA start date to December 23, 2022, which was while Defendant Lattig was still requiring Plaintiff to work while he was on sick leave.

14. In June 2023, Plaintiff recovered from COVID enough to return to work. On the recommendation of his medical provider, Plaintiff requested a temporary disability accommodation of permitting two days of remote work every week. The written policy at time allowed all Court employees to work from home up to one day a week without any medical reason. Plaintiff requested only one day more than the standard policy. This was a reasonable accommodation as Plaintiff's predecessor had worked remotely for much of their last year.

15. However, the Court administration notified Plaintiff via letter that Plaintiff would not be allowed to work remotely <u>at all</u>, making him the only Court employee who was not approved for remote work. The Court provided no

explanation why it was refusing Plaintiff's requested accommodation and no explanation why it was allowing Plaintiff even less work-from-home time, i.e., none at all, than other employees.

16. Because his return-to-work slip specified he should avoid working consecutive days on site for the first month of his return, Plaintiff suffered essentially an eight-day unpaid suspension upon returning to work.

17. On his first day back at work on June 21, 2023, Plaintiff met with Defendant Lattig and was shocked when Defendant Lattig relieved him of all managerial and supervisory responsibilities. Instead, Plaintiff became in charge of mainly therapy and care of juvenile offenders, which was the substance of his entry-level job before his promotion. While his salary remained the same, this move was effectively a demotion in every other sense.

18. Staff previously under Plaintiff's supervision were immediately reassigned to supervision by others. Plaintiff was no longer permitted to sign off as a "supervisor" on others' clinical reports, even though this was exclusively his duty prior to his leave. Plaintiff was no longer permitted to attend the weekly multidisciplinary Detention/Treatment meeting that he used to plan and chair. Defendant Lattig instructed Plaintiff to maintain a full-time caseload of a treatment specialist, providing direct-service therapy, assessments, and crisis response as his primary job functions. He was no longer permitted to be the final signatory on his own clinical reports, contrary to the practice in his role as the Court's chief clinician prior to his leave.

19. Defendant Lattig also removed Plaintiff from all projects on the extensive, written list of management projects he was previously assigned.

20. In this same meeting on his first day back, Defendant Lattig removed Plaintiff from Plaintiff's prior private office and his own dedicated desk, instead instructing him to use one of the small communal tables in a common area. Plaintiff's prior office was left vacant.

21. Soon after Plaintiff's return to work on June 21, 2023, Defendant Lattig effectively filled Plaintiff's supervisory position by Ann Heerde. Technically, Ms. Heerde only supervised Plaintiff. But in actuality, she managed and continues to manage the employees who Plaintiff supervised before his FMLA leave. Defendant Lattig also tasked Ms. Heerde with the bulk of Plaintiff's prior job duties from before Defendant Lattig stripped Plaintiff of his supervisory role.

22. On February 6, 2024, Plaintiff emailed Human Resources benefits analyst Erin Rotman about using FMLA for an upcoming surgery. The same day, Defendant Lattig and Ms. Heerde called him in to a meeting accusing him of being absent and late to work. Plaintiff presented evidence to the contrary and asked Defendant Lattig to look at his GPS location data, but Lattig refused. Despite this, Defendant Lattig told Plaintiff that from that point on, he was required to use his Outlook Calendar like a log of all his activities, and delete events scheduled in Outlook when a client is not home or does not show up to a scheduling meeting. Defendant Lattig also required Plaintiff to retroactively go back to January 1, 2024

and reconstruct this information from memory to add to his Outlook Calendar for past work activities.

23. Plaintiff initially thought he could outlast Defendant Lattig's behavior, and Plaintiff hoped he would return to Defendant Lattig's good graces once enough time passed after Plaintiff returned to work from his COVID medical leave. However, eventually it became too much to bear, especially once Plaintiff's new inquiry about potentially using medical leave for a minor surgery seemed to reignite Defendant Lattig's ire.

24. On February 11, 2024, Plaintiff emailed a written report detailing Defendant Lattig's harassment and retaliation to Circuit Court Administrator Susan Franklin, Ms. Heerde, and Zachary VanOsdol, who worked in Human Resources for Ottawa County, which provides HR services for the Court. In his written report, Plaintiff identified Defendant Lattig's behavior toward Plaintiff since his return to work in June 2023 as retaliation for his use of FMLA. Per policy, the Court should have done an investigation of Plaintiff's report of retaliation, but upon information and belief, no one investigated Plaintiff's report or took action.

25. On April 4, 2024, Ms. Heerde contacted Plaintiff to meet with her and Defendant Lattig. Plaintiff was apprehensive about the meeting, as it was his work anniversary date with the Court the next day, meaning that if he was still employed at midnight, he would receive a deposit of 160 vacation hours with a payable value of over $7,000 before taxes upon termination. Therefore, he requested a neutral

observer if it was a termination or disciplinary meeting. In response, Ms. Heerde canceled the meeting.

26. On or around May 2, 2024, Plaintiff was called into a meeting with Mr. VanOsdol and Ms. Heerde. Mr. VanOsdol acknowledged that Plaintiff had made some "very serious allegations," but neither Mr. VanOsdol nor Ms. Heerde otherwise addressed Plaintiff's February 2024 report of discrimination.

27. On May 2, 2024, the Court issued a written reprimand to Plaintiff memorializing the allegations that he was late to work on instances in January and February. These allegations are and were provably false and internally inconsistent. Each alleged violation occurred in the window during which Defendant Lattig instructed Plaintiff to retroactively change his calendar. Plaintiff protested the reprimand and the underlying allegations, but as a consequence for the reprimand, Defendant Lattig required Plaintiff to indefinitely change his shared Outlook Calendar to a detailed retrospective log of daily activities. This harmed Plaintiff's credibility with his coworkers, who turned his detailed calendar into a running joke. Relatedly, Plaintiff had to keep Ms. Heerde thoroughly informed of his location through text, including incidental events like bathroom breaks. In addition, Plaintiff was no longer allowed to use the variable workday scheduling option and had to immediately change the start of his workday from 8:30 am. Plaintiff was also forced to find a card reader at the beginning of the day and scan his badge, even when starting his workday at places like the Grand Haven Courthouse where his badge does not grant access. This led to Court bailiffs

questioning Plaintiff about this unusual behavior and awkward encounters with coworkers when he could not allow them to hold open the door for him, because he needed to find a badge scanner and scan it to create a record of the time of his entrance. To his knowledge, Plaintiff was the only one with these restrictions.

28. During this time period, the Court was working on moving the Juvenile Court to a new Family Justice Center. While the project was being planned, saved blueprints and schematics show that Plaintiff had been originally assigned a private corner office on the second floor. After Plaintiff submitted his harassment complaint, this office was reassigned to the Probation Manager, and Plaintiff was eventually informed that there was no space for him to physically work at the Family Justice Center with the majority of the Juvenile Court staff.

29. In early 2022, prior to needing FMLA leave for COVID recovery, Plaintiff was heavily involved in planning the Fiscal Year 2023 budget. However, after taking FMLA leave, Court administration excluded Plaintiff entirely from the planning process for the Fiscal Year 2024 budget, which resulted in a significant loss of funds to his unit budget – much of these costs shifted to Plaintiff personally. For instance, the Court had previously funded Plaintiff's completion of Master Training from ATSA, and his Juvenile Risk Assessment and Violence Risk Assessment certification, but these were both cut. ATSA training and risk assessment certifications were and are considered integral to Plaintiff's job duties. Court administration informed Plaintiff that the Court would approve of his completion of the risk assessment program only if Ms. Heerde took the courses

9

before him or with him. However, since Ms. Heerde is not a psychologist, she was not eligible for this program. In addition, the Court no longer paid for Plaintiff's counselor licensure supervision. Upon information and belief, Plaintiff was at that time the first and only Court treatment staff member to ever pay for licensure supervision. Other 2024 budget cuts to licensing and credentialing affected Plaintiff directly as well.

30. Around October 2024, other employees started voicing their concern and confusion about Defendant Lattig's targeting of Plaintiff, including confusion as to why he was not allowed to attend meetings which he always used to participate in. During an all-staff meeting in 2024, another employee questioned Plaintiff's title of "manager" because he did not appear to that person to manage anything or anyone. Other employees expressed that they believed Plaintiff had resigned from his management role after returning from FMLA leave in June 2023, which is untrue.

31. On October 16, 2024, Plaintiff informed HR and Ms. Heerde that he required the surgery he had previously asked about and would formally request FMLA soon to recover from said surgery. Since Plaintiff had not heard anything since his initial February 2024 report of harassment and discrimination, Plaintiff also inquired via email at the same time with HR about the status of his initial report, noting his concerns about Defendants' retaliation toward him since.

32. On November 5, 2024, among other targeted budget cuts, Ms. Heerde informed Plaintiff that the funding for psychological testing instruments had been

10

cut. As the Juvenile Court's only psychologist, this change only affected Plaintiff. He pointed out that should he need to perform any more tests, he had an ethical and licensing obligation to use current, valid instruments that cost money and asked if the Court's expectation was that he would personally pay for said instruments. Plaintiff never received a response.

33. In December 2024, shortly after he notified Ms. Heerde and HR of his now-scheduled upcoming surgery, Court administration informed Plaintiff that he would be reassigned to his old office, although it was now a shared office. When he moved into his old office on January 20, 2025, he discovered that it had almost no working heat. Multiple meetings had to be relocated because the office was too cold for others to be in. Ms. Heerde would wear a coat and gloves if meeting with Plaintiff in his office. In attempting to find a long-term solution to the cold, Plaintiff discovered an email from facilities maintenance that someone from the Court had requested the heat to be turned off or significantly cut right around the time that Plaintiff was meant to move into it.

34. Another employee then approached Plaintiff and asked him about Plaintiff's upcoming surgery about which he had only informed HR staff and Ms. Heerde when requesting FMLA leave. On January 24, 2025, when Plaintiff expressed his discomfort to Ms. Heerde that this medical information had been shared, she apologized and explained it was announced to the managers during a managers meeting.

35. Defendants used targeted budget cuts, constructive demotion, the disciplinary process, and exclusion from prime office space in the Family Justice Center to retaliate against Plaintiff for his use of FMLA, his requests for minimal disability accommodations, and his reports of unlawful treatment.

36. Plaintiff has been unable to locate other equivalent job positions at another employer to escape Defendants' treatment of him at the Court. One problem in locating equivalent work is that Plaintiff has a tuition reimbursement obligation which he will owe if he resigns his employment, meaning that changing jobs would likely cause him significant additional economic loss. Plaintiff does not fully vest in his retirement until April 2026 and must leave significant value in his earned retirement account behind if he resigns from Court employment before then. There are also a very limited number of equivalent juvenile court job opportunities in other counties, particularly within reasonable commuting distance of Plaintiff's current residence. Yet another significant impediment to leaving the Court is that Plaintiff also lives in Ottawa County and is already established in that community with strong local family ties. Plaintiff is committed to working in public service where he lives, and for the most part, enjoys and respects the vast majority of professionals he works with at the Court.

37. Finally, Defendant Lattig has a longstanding reputation among juvenile court management professionals locally and across the state, and Plaintiff is reasonably concerned that Defendant Lattig can and would blackball him for other opportunities. Defendant Lattig has a history of explicitly vocalizing his

willingness and even excitement about opportunities to interfere with employees who he believes have crossed him when they apply for other job positions.

### Count I – Violation of the FMLA – Interference and Retaliation

38. Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

39. Plaintiff was an eligible employee entitled to FMLA leave at the time he requested it in December 2022.

40. Plaintiff requested a qualifying medical leave under the FMLA by giving Defendants proper notice of his entitlement to FMLA leave.

41. Defendants are employers and covered entities as defined by the FMLA.

42. Defendants violated the FMLA by interfering with, denying and/or attempting to interfere with and deny, Plaintiff's rights under FMLA, contrary to 29 U.S.C. § 2615(a)(1). Defendants also violated the FMLA by retaliating against Plaintiff for using approved FMLA medical leave.

43. Defendants interfered with Plaintiff's FMLA leave, and retaliated against Plaintiff for his exercise of FMLA rights, by effectively demoting him upon his return to work, and by failing to restore him to his same or an equivalent job position.

44. Defendants interfered with Plaintiff's FMLA leave, and retaliated against Plaintiff for his exercise of FMLA rights, by requiring him to work during his medical leave.

45. Defendants interfered with Plaintiff's FMLA leave, and retaliated against Plaintiff for his exercise of FMLA rights, by retaliating against Plaintiff in various other ways as described aforesaid.

46. Defendants willfully violated the FMLA by their actions and caused Plaintiff to suffer damages for which Defendants are liable.

47. As a result of the foregoing, Plaintiff has lost earnings and benefits and incurred mental anguish, emotional distress, unfair reputational damage, and legal costs for which Defendants are liable.

WHEREFORE, Plaintiff requests that this Court award Plaintiff economic and compensatory damages in an amount that would fully compensate him for the injuries alleged herein, restore Plaintiff to his prior job position and job duties, compensate him for his costs and reasonable attorney fees, and order such other relief as may be just and equitable.

### Count II – Violation of Michigan's PWDCRA

48. Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

49. Plaintiff's long COVID is a disability as defined by the PWDCRA, Mich. Comp. Laws § 37.1103(d).

50. Defendants are "employers," as defined by the PWDCRA, Mich. Comp. Laws § 37.1201(b).

51. Defendants discriminated against Plaintiff when they failed to accommodate Plaintiff by permitting him to work from home as he continued to

recuperate from his illness, despite the widespread availability of that option to him previously and to others in similar job functions.

52.    Defendants discriminated against Plaintiff for taking medical time off to recuperate from long COVID by demoting him because he took a medical leave and asked not to have to work during his medical leave, and because he asked for reasonable accommodations upon his return to work.

53.    Plaintiff's requested accommodations did not impose an undue hardship upon Defendants.

54.    Defendants refused Plaintiff the reasonable accommodations that he requested, and refused to engage in any good faith, interactive process to determine necessary and reasonable accommodations for Plaintiff.

55.    Defendants constructively discharged Plaintiff when it refused to allow him to return to his prior job as a supervisor.

56.    Defendants retaliated against Plaintiff when he reported that Defendants' actions violated his right to reasonable accommodations and to be free from discrimination after taking medical leave to recuperate from long COVID. Defendants retaliated and discriminated against Plaintiff by all of the actions as alleged aforesaid.

57.    Defendants' actions violated the PWDCRA and caused Plaintiff to suffer damages for which Defendant is liable.

58.    As a result of the foregoing, Plaintiff has lost earnings and benefits and incurred mental anguish, emotional distress, unfair reputational damage, and

legal costs for which Defendants are liable.

WHEREFORE, Plaintiff requests that this Court award Plaintiff economic and compensatory damages in an amount that would fully compensate him for the injuries alleged herein, restore Plaintiff to his prior job position and job duties, compensate him for his costs and reasonable attorney fees, and order such other relief as may be just and equitable.

                              PINSKY SMITH, PC
                              Attorneys for Plaintiff

Dated: November 12, 2025        By:/s/ *Sarah R. Howard*
                              Sarah Riley Howard
                              146 Monroe Center St NW, Suite 418
                              Grand Rapids, MI  49503
                              (616) 451-8496
                              showard@pinskysmith.com

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth above, Plaintiff hereby demands same.

                                        PINSKY SMITH, PC
                                        Attorneys for Plaintiff

Dated: November 12, 2025         By:/s/ *Sarah R. Howard*
                                        Sarah Riley Howard
                                        146 Monroe Center St NW, Suite 418
                                        Grand Rapids, MI  49503
                                        (616) 451-8496
                                        showard@pinskysmith.com